## UNITED STATES DISTRICT COURT

## DISTRICT OF SOUTH DAKOTA

## WESTERN DIVISION

| | |
|---|---|
| BLACK HILLS MOLDING, INC.,<br><br>                    Plaintiff,<br><br>        vs.<br><br>BRANDOM HOLDINGS, LLC,<br><br>                    Defendant. | CIV. 12-5051-JLV<br><br>ORDER |

## INTRODUCTION

Plaintiff Black Hills Molding, Inc., filed a complaint against the defendant Brandom Holdings, LLC, in the Seventh Judicial Circuit Court for Pennington County, South Dakota.   (Docket 1-1).   The complaint alleges breach of contract and promissory estoppel against the defendant.   Id.   Brandom Holdings timely filed a notice of removal pursuant to 28 U.S.C. §§ 1332 and 1446.   Id. Defendant denies plaintiff's claims.   (Docket 20).   Pending before the court is the defendant's motion for summary judgment.   (Docket 46).   Plaintiff resists defendant's motion.   (Docket 54).   For the reasons stated below, defendant's motion for summary judgment is denied.

## STANDARD OF REVIEW

Under Fed. R. Civ. P. 56(a), a movant is entitled to summary judgment if the movant can "show that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."   Fed. R. Civ. P. 56(a). Once the moving party meets its burden, the nonmoving party may not rest on

the allegations or denials in the pleadings, but rather must produce affirmative evidence setting forth specific facts showing that a genuine issue of material fact exists.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 256 (1986).   Only disputes over facts that might affect the outcome of the case under the governing substantive law will properly preclude summary judgment.   <u>Id.</u> at p. 248.

"[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   <u>Id.</u> at 247-48 (emphasis in original).

   If a dispute about a material fact is genuine, that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party, then summary judgment is not appropriate.   <u>Id.</u>   However, the moving party is entitled to judgment as a matter of law if the nonmoving party failed to "make a sufficient showing on an essential element of her case with respect to which she has the burden of proof."   <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). In such a case, "there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."   <u>Id.</u> at p. 323.

   In determining whether summary judgment should issue, the facts and inferences from those facts must be viewed in the light most favorable to the nonmoving party.   <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

574, 587-88 (1986). The key inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at pp. 251-52.

## FACTUAL SUMMARY

The following recitation consists of the material facts developed from the complaint (Docket 1-1), defendant's answer (Docket 20), defendant's statement of undisputed material facts (Docket 48), plaintiff's response to defendant's statement of undisputed material facts (Docket 53) and other evidence where indicated. Where a statement of fact is admitted by the opposing party, the court will only reference the initiating document. These facts are "viewed in the light most favorable to the [plaintiff] opposing the motion." Matsushita Elec. Indus. Co., 475 U.S. at 587. The facts material to defendant's motion for summary judgment are as follows.

Black Hills Molding, Inc., ("BH Molding") is a South Dakota corporation operating in Rapid City, South Dakota. (Docket 1-1 ¶ 1). BH Molding is a manufacturer of drawer and cabinetry components. (Docket 48 ¶ 2). BH Molding had a business relationship with Brandom Southwest, Ltd., ("Brandom Southwest") under which plaintiff would import product from China and cut that product to Brandom Southwest's specifications. Id. ¶ 3.

On July 10, 2006, BH Molding and Brandom Southwest entered into a Non-Circumvention and Sales Agreement ("Sales Agreement"). Id. ¶ 4. David

Mallams[1] and Andy Collins[2] signed the Sales Agreement on behalf of BH Molding and Brandom Southwest, respectively.   (Dockets 51-2 at p. 4; 52-6 at p. 13:10-14-3; 53 ¶ 16).   Matt Collins, Andy's son, was the purchasing manager for Brandom Southwest.   (Docket 53 ¶ 16).

The Sales Agreement provided that BH Molding would maintain six to eight weeks' worth of inventory in Rapid City to fill orders for Brandom Southwest. (Docket 48 ¶ 5).   The Sales Agreement imposed two obligations on Brandom Southwest.   Id. ¶ 6.   First, the Sales Agreement prevented Brandom Southwest from working directly with BH Molding's overseas suppliers.   Id.   Second, the Sales Agreement required Brandom Southwest to purchase any excess inventory remaining at BH Molding upon termination of the business relationship with plaintiff.   Id.   BH Molding required these commitments to protect the integrity of its overseas supplier relationships and to mitigate any financial risk it might be exposed to resulting from holding any excess inventory ordered from its overseas suppliers on behalf of Brandom Southwest.   Id. ¶ 7.   The inventory-purchase provision was sufficiently important that BH Molding probably would not have purchased inventory to hold for Brandom Southwest if it refused to sign the Sales Agreement.   Id. ¶ 8.

Following execution of the Sales Agreement in 2006, BH Molding began stocking inventory in Rapid City to fill orders for Brandom Southwest.   Id. ¶ 9.

---

[1]David Mallams was the sales manager for BH Molding.   (Docket 9-1 ¶ 1).

[2]Andy Collins was a principal in Brandom Southwest.   (Docket 48 ¶ 19).

At the end of 2006, BH Molding held only a "pretty small amount" of inventory for Brandom Southwest.  Id. ¶ 10.   In 2007, BH Molding relied on usage projections from Brandom Southwest to order inventory to hold for filling Brandom Southwest's orders.  Id. ¶ 11.   The same projections and inventory system was used in 2008.  Id. ¶ 12.   By the end of 2008, the inventory held by BH Molding increased from the levels held in 2007.  Id. ¶ 13.   The inventory held by BH Molding to fill Brandom Southwest's orders reached its peak on August 10, 2009, totaling $304,617.18.[3]  Id. ¶ 14.

Brandom Holdings, LLC, ("Brandom Holdings") was organized under Texas law on September 30, 2008.  Id. ¶ 15.   On October 1, 2008, Brandom Holdings entered into an Asset Purchase Agreement with Brandom Southwest and its owners, David Capps, Andy Collins, and Brandom Manufacturing of Texas, Inc. Id. ¶ 19.   By the terms of the Asset Purchase Agreement, Brandom Holdings acquired certain assets and assumed certain defined contractual obligations of Brandom Southwest.[4]  Id. ¶¶ 20 & 21.   The Sales Agreement between BH Molding and Brandom Southwest was not listed in the contractual obligations assumed by Brandom Holdings.  Id. ¶ 23.

---

[3]Plaintiff objected to this statement to the extent defendant asserted this inventory was held for Brandom Southwest, because Brandom Southwest ceased to exist in September 2008.   (Docket 53 ¶ 14) (referencing Docket 52-7 at p. 5).   Plaintiff does not object to the remainder of the statement.

[4]Plaintiff's objection to this statement relates not to the legal implications, but rather to subsequent communications which plaintiff claims impacted the actual effect of the acquisition by Brandom Holdings.   (Docket 53 ¶ 21).

Andy Collins was a principal member of Brandom Holdings. (Docket 53 ¶ 16). Matt Collins remained as the purchasing manager for Brandom Holdings. Id. Brandom Southwest had been doing business as "Brandom Cabinets" and that business name was acquired by Brandom Holdings. (Docket 52-7 at p. 9). Brandom Holdings continued to do business as "Brandom Cabinets." (Docket 52-1 at p. 1). Brandom Holdings continued using the e-mail address for its employees previously used by Brandom Southwest ending in "@brandom.com." (Compare Dockets 51-2 at p. 5; 52-8; 52-4; 52-5 & 52-2) (chronologically). Brandom Southwest and Brandom Holdings had the same physical address: 404 Hawkins Street, Hillsboro, TX 76645. (Dockets 52-1 at p. 1; 53 ¶ 16). Both companies used the same toll free telephone number: 800-336-8001. (Dockets 51-2 at p. 3; 52-2 at p. 1; 53 ¶ 16). Inventory parts numbers were the same for Brandom Southwest and Brandom Holdings. (Docket 53 ¶ 16).

In the fall of 2009, David Mallams spoke with Matt Collins regarding the ownership change between Brandom Southwest and Brandom Holdings. (Docket 53 ¶ 25). As the purchasing manager for both Brandom Southwest and Brandom Holdings, Matt Collins was responsible for hundreds of thousands of dollars in lumber both companies needed to conduct their business. Id. Matt Collins told David Mallams that even though Brandom Southwest had been purchased by another company, BH Molding need not worry as it was still

"business as usual."   (Docket 53 ¶ 16) (referencing Docket 52-6 at pp. 33:4-34:24).

After David Harvick became the purchasing manager for Brandom Holdings, he and Gary Mallams[5] discussed the Sales Agreement.   (Docket 53 ¶ 34) (referencing Docket 52-9 at p. 25:3-17).   Gary Hallams told him about the Sales Agreement and that BH Molding "relied on Brandom Holdings to honor that agreement because we were told that business would be going on as usual." (Docket 52-9 at p. 25:17-20).   Mr. Harvick asked that a copy of the Sales Agreement be faxed to Lena, an employee in accounting or some other office of Brandom Holdings.   Id. at p. 26:5-22.   A BH Molding secretary faxed the document.   Id. at p. 26:10-22.

Later in the winter of 2009, Gary Mallams spoke with Joe Parziale who replaced Mr. Harvick in the purchasing department.   (Docket 53 ¶ 38) (referencing Docket 52-9 at p. 29:11-12).   During their conversation, Mr. Parziale said he was aware of the Sales Agreement.   (Docket 52-9 at p. 29:6-10). They discussed the portion of the Sales Agreement which made Brandom Holdings "responsible for the inventory if they quit taking it."   Id. at p. 28:6-10. Because Mr. Parziale felt he was going to be responsible for the inventory in the Sales Agreement, he was "going to do the ordering."   Id. at p. 27:14-25.   They had another conversation in early 2010 in which Mr. Parziale said he should be

---

[5]Gary Mallams was the President of BH Molding.   (Docket 48 ¶ 53).

managing the inventory held by BH Molding because Brandom Holdings was "responsible" for that inventory.   (Docket 48 ¶ 38).

Beginning in 2010, Brandom Holdings began working with BH Molding to reduce the inventory previously stocked to fill orders for Brandom Southwest. Id. ¶ 43.   Some of that inventory was ordered in October 2009 after Brandom Holdings entered the picture.   (Docket 53 ¶ 43).   To prove this point BH Molding submitted a photograph of a shipping label dated October 27, 2009, shipping 900 pieces of part "BR14707."[6]   (Docket 52-3).   Also in 2010, Brandom Holdings began issuing specific instructions to BH Molding as to what inventory should be purchased.   (Docket 48 ¶ 45).   The merchandise was prepared to Brandom Holdings' specifications and was not available for sale to anyone else due to those specific dimensions.   (Docket 53 at ¶ 45).

David Mallams had two conversations with Phyllis Brennan in the spring or summer of 2011.   Id. ¶ 40.   Ms. Brennan had replaced Mr. Parziale in the purchasing department of Brandom Holdings.   Id.   David Mallams told Ms.

---

[6]Defendant objects to Exhibit 3 as an unauthenticated photograph without proper foundation.   (Docket 57 ¶ 43 (reply)).   Exhibit 3 is identified in the affidavit of Gregory Sperlich as "a true and correct copy of a shipping label from existing Black Hills Molding stock which is the subject of this lawsuit indicating this product was shipped from the factory on October 27, 2009." (Docket 52 ¶ 5).   There are numerous references to fourteen thousand series invoice items documented in this case.   (Dockets 52-1; 52-2 at pp. 1-2 & 5; 52-4 at pp. 2 & 9; 52-8 at pp. 3-5; and 51-11).   Invoice item 14707 is one of the items in plaintiff's final invoice to Brandom Holdings dated March 1, 2012.   (Docket 51-11 at p. 1).   For summary judgment purposes defendant's objection is overruled.

Brennan that Brandom Holdings was obligated to purchase the excess inventory which BH Molding had on hand. Id. On August 19, 2011, Ms. Brennan e-mailed David Mallams asking: "Please send me documentation of Brandom's agreements to order containers and pay for cutting/refinishing charges over and above the price quoted." (Docket 52-2 at pp. 2-3).[7] In an August 22, 2011, e-mail to Ms. Brennan, David Mallams wrote:

> The container orders being taken over by Brandom occurred when Joe came in and happened about May of 2010. We discussed our inventory mess here due to in accurate [sic] usage numbers. Joe made the decision that since Brandom was responsible for the inventory we had here that he should be making the decisions as to what we are going to order in future containers.

(Docket 52-2 at pp. 2-3). Included in David Mallams' e-mail was John Huff, a consultant and later Vice President of Operations for Brandom Holdings.[8] Id.; see also Docket 50 ¶ 3.

The last inventory acquisition by BH Molding, based on Brandom Holdings' purchase order, was in the spring of 2011. (Docket 48 ¶ 46). By March 2012, Brandom Holdings ceased purchasing cabinetry components from BH Molding. Id. ¶ 47. As a result of efforts by Brandom Holdings to manage

---

[7]Pages 2 and 3 of Docket 52-2 are reversed in CM/ECF. Only by reversing the pages and then examining the dates and times of e-mail exchanges do these pages make sense. Compare Docket 52-2 at p. 7.

[8]This appears to be in conflict with Mr. Huff's sworn statement that Brandom Holdings "was unaware of any contractual obligation . . . to purchase excess inventory held by Black Hills Molding." (Docket 50 ¶ 8).

the inventory at BH Molding, the amount of inventory decreased from its 2009 peak of $304,617.18 to $77,147.35 in March 2012. Id. ¶ 44.

On March 13, 2012, David Mallams contacted Brandom Holdings demanding that it honor the terms of the Sales Agreement. (Docket 53 ¶ 48). In an e-mail of that same date, BH Molding referenced the existence of a "signed legal contract" obligating Brandom Holdings to "take all the material we [BH Molding] had left." (Docket 48 ¶ 49). In response, Brandom Holdings claimed it was unaware of the existence of the Sales Agreement and denied any obligation to purchase the inventory held by BH Molding. (Docket 53 ¶¶ 51-52).

Gary Mallams testified that had BH Molding learned in the late summer of 2009 that Brandom Holdings would not honor the Sales Agreement, plaintiff would have stopped doing business with the defendant and filed a lawsuit to recover the approximately $300,000 in inventory on hand at that time. (Dockets 48 ¶ 53; 53 ¶ 53). David Mallams testified that it was impossible to identify when the inventory was purchased and whether it was purchased based on statements made by employees of Brandom Southwest or Brandom Holdings, although some of the inventory can be traced to Brandom Holdings. (Dockets 48 ¶ 58; 53 ¶ 58).

## DISCUSSION

Plaintiff alleges breach of contract and promissory estoppel against the defendant. (Docket 1-1). BH Molding is a South Dakota corporation and Brandom Holdings is a Texas limited liability company. Id. ¶¶ 1-2. The court

previously determined it had jurisdiction pursuant to 28 U.S.C. § 1332. (Docket 18 at p. 1) (adopting the report and recommendation of United States Magistrate Judge Veronica L. Duffy dated November 5, 2012 (Docket 12) (citing 28 U.S.C. § 1332).

Brandom Holdings' motion for summary judgment asserts it is entitled to judgment as a matter of law on both of plaintiff's claims. (Docket 47). Plaintiff resists defendant's motion for summary judgment. (Docket 55). Defendant's motion for summary judgment challenging each claim will be separately addressed.

BREACH OF CONTRACT

BH Molding's breach of contract claim asserts Brandom Holdings is liable under the terms of the Sales Agreement. Plaintiff claims "Brandom Holdings, LLC, and its predecessor, Brandom Southwest, entered into a contract in the state of South Dakota with Black Hills Molding, Inc., for the purpose of purchasing inventory to Brandom specification and further in house fabrication of drawer components." (Docket 1-1 ¶ 3). Plaintiff alleges it suffered damages of "$77,147.35 plus interest and accruing storage fees." Id. ¶ 32.

Brandom Holdings advances two arguments: first, it was not a signatory to the Sales Agreement; and second, the Sales Agreement was not included in the liabilities Brandom Holdings assumed at the time of the purchase of the assets of Brandom Southwest. (Docket 47 at p. 10). For these reasons, Brandom

Holdings asserts it "cannot, as a matter of law, be liable to Black Hills [Molding]." Id. at p. 13.

BH Molding counters that Brandom Southwest and Brandom Holdings "continued on with the same principles, in the same line of business, with the same name. . . . They did not inform their supplier, Black Hills Molding, of the sale. . . . There was an unbroken line of business between Brandom Southwest and Brandom Holdings" making Brandom Holdings liable under the Sales Agreement.   (Docket 55 at p. 7).   Plaintiff asks the court to apply the "mere continuation theory" and find that Brandom Holdings is the "same company" and "should not be able to disclaim liability here."   Id. at p. 11.

The defendant acknowledges South Dakota recognizes the "mere continuation theory" under certain circumstances, but that "Texas law has an absolute bar on successor liability under . . . the 'mere continuation' theory." (Docket 56 at p. 7).   Because of this conflict, defendant argues the court should do a choice of law analysis.   Id.   Once the choice of law analysis is conducted, Brandom Holdings argues the court must apply Texas law and find defendant is not liable to BH Molding on the breach of contract claim.   Id. at p. 11.

The defendant acknowledges that in a diversity case the court applies the law of the forum state.   Id. at pp. 7-8 (referencing Simpson v. Liberty Mutual Insurance Co., 28 F.3d 763, 764 (8th Cir. 1994) ("Federal district courts must apply the choice-of-law rules of the state in which they sit when jurisdiction is

based on diversity of citizenship.") (citation omitted).   Brandom Holdings admits
Simpson requires the court to apply South Dakota's choice of law rules.   Id.

Brandom Holdings argues SDCL § 53-1-4 compels the court to apply
"Texas law . . . to the question of what successor liability Brandom Holdings'
retained as the result of its Asset Purchase Agreement with Black Hills
Molding."[9]   (Docket 56 at p. 8).   SDCL § 53-1-4 states: "A contract is to be
interpreted according to the law and usage of the place where it is to be
performed or, if it does not indicate a place of performance, according to the law
and usage of the place where it is made."

The Asset Purchase Agreement executed by Brandom Southwest and
Brandom Holdings expressly provided that it was to be governed by Texas law.
(Docket 51-8 ¶ 8.6).   Texas law provides:

> (a) A disposition of all or part of the property of a domestic
> entity . . . is not a merger or conversion for any purpose.
>
> (b) Except as otherwise expressly provided by another statute,
> a person acquiring property described by this section may
> not be held responsible or liable for a liability or obligation
> of the transferring domestic entity that is not expressly
> assumed by the person.

TEX. BUS.ORGS. CODE ANN. § 10.254 (Vernon).   "Texas courts have
interpreted article 5.10 [the predecessor statute to § 10.254] as expressly
abrogating the mere continuation doctrine as a means of imposing successor

---

[9]To be clear, the Asset Purchase Agreement exists between Brandom
Southwest and Brandom Holdings and there is no written contract between
Brandom Holdings and BH Molding.

liability." E-Quest Management, LLC v. Shaw, 433 S.W.3d 18, 24 (Tex. App.
2013). "Texas law authorizes a successor to acquire the assets of a corporation
without incurring any of the grantor corporation's liabilities unless the successor
expressly assumes those liabilities." Id. The court agrees Texas expressly
abrogated the "mere continuation theory."

If Texas law applies, it is clear that under the Asset Purchase Agreement
Brandom Holdings did not assume responsibility for the debt of Brandom
Southwest with BH Molding. The question remains under Texas law whether
Brandom Holdings "expressly assumed"[10] the liability of Brandom Southwest by
its subsequent communications and actions with BH Molding. For the reasons
stated below, the application of Texas law need not be resolved.

It is the contractual arrangement between BH Molding and Brandom
Holdings which must be examined under SDCL § 53-1-4. While Brandom
Holdings may argue its contract with BH Molding should be examined under
Texas law, the facts require a different conclusion. BH Molding was not a party
to the Asset Purchase Agreement and was not aware of its existence.

Even without application of the Sales Agreement between BH Molding and
Brandom Southwest, it is undisputed Brandom Holdings contracted to purchase
cabinetry components in South Dakota and to have the inventory delivered to

---

[10]"Expressly" is defined as "[i]n direct or plain terms; clearly, explicitly,
definitely." Oxford English Dictionary, Oxford University Press, on-line ed.,
2015. "Expressed" is defined as "[d]eclared in direct terms; stated in words; not
left to inference or implication." Black's Law Dictionary 661 (9th ed. 2009).

and stored at BH Molding's Rapid City, South Dakota, facility. The relationship of the parties must be interpreted according to the law of South Dakota as the place where the contract was to be performed. SDCL § 53-1-4. Whether the Sales Agreement was part of the contractual arrangement between BH Molding and Brandom Holdings is a question which must be resolved under South Dakota law.

The defendant acknowledges that South Dakota recognizes the "mere continuation theory." (Docket 56 at p. 7). "The general rule is that a corporation which purchases the assets of another corporation does not succeed to the liabilities of the selling corporation." Hamaker v. Kenwel-Jackson Machine, Inc., 387 N.W.2d 515, 518 (S.D. 1986). "There are, however, four exceptions to the general rule under which liability may be imposed on a purchasing corporation." Id. Those exceptions are:

(1)    when the purchasing corporation expressly or impliedly agrees to assume the selling corporation's liability;

(2)    when the transaction amounts to a consolidation or merger of the purchaser and seller corporations;

(3)    when the purchaser corporation is merely a continuation of the seller corporation; or

(4)    when the transaction is entered into fraudulently to escape liability for such obligations.

Id. (citation omitted). The two exceptions articulated in Hamaker which may apply to this case are: whether Brandom Holdings "expressly or impliedly" agreed

to assume Brandom Southwest's obligations to BH Molding; and whether Brandom Holdings "is merely a continuation" of Brandom Southwest.   Id.

As discussed above, the "expressly agreed" exception is the same issue which would be resolved if Texas law applied.   On the other hand, whether Brandom Holdings "impliedly agreed" to assume Brandom Southwest's obligation or is "merely a continuation of" Brandom Southwest so as to make defendant liable are issues which must be resolved under South Dakota law.

"The key element of a 'continuation' is a commonality of the officers, directors, and stockholders in the predecessor and successor corporations."   Id. The South Dakota Supreme Court also recognized "that cash consideration was sufficient to establish a prima facie case of continuation of a successor corporation's responsibility for products liability . . . ."   Id.   Those cash consideration factors are:

(1)     There was basic continuity of the enterprise of the seller corporation, including, apparently, a retention of key personnel, assets, general business operations, and the corporate name.

(2)     The seller corporation ceased ordinary business operations, liquidated, and dissolved soon after distribution of consideration received from the buying corporation.

(3)     The purchasing corporation assumed those liabilities and obligations of the seller ordinarily necessary for the continuation of the normal business operations of the seller corporation.

(4)     The purchasing corporation held itself out to the world as the effective continuation of the seller corporation.

16

Id. at p. 519; see also Parker v. Western Dakota Insurers, Inc., 605 N.W.2d 181, 184 (S.D. 2000) (citing the Hamaker factors).

BH Molding argues Andy Collins was a shareholder in both Brandom Southwest and Brandom Holdings and that his son Matt was the purchase manager for both companies.   (Docket 55 at p. 7).   In addition, BH Molding argues the two companies "continued on with the same principles, in the same line of business, with the same name . . . . There was an unbroken line of business between Brandom Southwest and Brandom Holdings . . . ."   Id.   For summary judgment purposes, Brandom Southwest quit doing business while Brandom Holdings continued doing business as "Brandom Cabinets" at the same address, with the same toll-free telephone number and using the same product invoice numbers.

Whether Brandom Holdings expressly or impliedly contracted with BH Molding to assume the debt due from Brandom Southwest or whether Brandom Holdings is a mere continuation of Brandom Southwest requires resolution of material factual disputes which cannot be resolved at the summary judgment stage.   Those issues are jury questions for resolution at trial.   Defendant's motion for summary judgment on plaintiff's breach of contract claim is denied.

PROMISSORY ESTOPPEL[11]

"Promissory estoppel may be invoked where a promise alters his position to his detriment in the reasonable belief that a promise would be performed." Garrett v. BankWest, Inc., 459 N.W.2d 833, 848 (S.D. 1990). In order to prevail on a promissory estoppel claim, plaintiff must show the following:

1. The detriment suffered in reliance must be substantial in an economic sense;

2. The loss to the promisee must have been foreseeable by the promisor; and

3. The promisee must have acted reasonably in justifiable reliance on the promise made.

Id. "Estoppel is not applicable if any of these elements are lacking or have not been proven by clear and convincing evidence." Hahne v. Burr, 705 N.W.2d 867, 873 (S.D. 2005). "Estoppel depends on the facts of each case and ordinarily presents a question for the jury. . . . When the exact nature of the representations and the reasonableness of the reliance upon them are disputed, the issue of estoppel should be presented to a fact finder. . . . In addition, summary judgment is not proper where a state of mind is involved." Garrett, 459 N.W.2d at 848.

The parties agree plaintiff's promissory estoppel claim is predicated on the existence of a promise by Brandom Holdings that it would honor the obligations of Brandom Southwest in the Sales Agreement. (Dockets 55 at p. 13; 56 at p.

_____

[11]Brandom Holdings acknowledges that South Dakota law applies to plaintiff's promissory estoppel claim. (Docket 56 at p. 8 n.4).

12).   Defendant argues neither it nor any of its representatives expressly made a promise to be responsible for Brandom Southwest debts to plaintiff under the Sales Agreement.   (Docket 56 at pp. 12-13).   Because no promise was ever made, defendant argues there is no basis for a promissory estoppel claim.   Id. at p. 13.

Defendant acknowledges "Andy Collins,[12] a purchasing manager for Brandom Southwest who continued in that position as an employee of Brandom Holdings for several months . . . told [David] Mallams that: (1) there had been an 'ownership change' at Brandom Southwest and (2) as to [BH Molding] 'business would continue as usual.' " Id.   Yet, defendant argues the latter statement "was made in a vacuum and without any reference to any kind of the specific contractual obligations owed by Brandom Southwest . . . ." Id. at pp. 13-14. Plaintiff disputes this categorization since Matt Collins was the purchasing manager who "understood the course of performance between [BH Molding and Brandom Southwest]" and had "dealt with David Mallams for a number of years and would know David would understand [the statement] to mean Black Hills Molding[] would continue to purchase inventory from China, have it shipped to Black Hill's warehouse, have [the inventory] dove tailed to Brandom's specifications, and store the inventory until Brandom needed it."   (Docket 55 at p. 12).

---

[12]The court presumes that "Andy Collins" is a typographical error because it was Matt Collins, Andy's son, who was the purchasing manager for Brandom Southwest.   (Docket 53 ¶ 16).

Defendant claims that when David Harvick asked "for a copy of the 'purchasing commitment' from Brandom Holdings" and Gary Mallams had the Sales Agreement faxed to Brandom Holdings, this process cannot be "construed as a promise of any kind." (Docket 56 at p. 14). Defendant argues Mr. Harvick's action was just "simply a request" and not part of a promise to obligate Brandom Holdings. Id.

Defendant's third objection is the plaintiff's focus on a statement made by Mr. Parziale, a later purchasing agent for Brandom Holdings, when he said "he understood Brandom Holdings to be 'responsible' for the inventory" with BH Molding. Id. at pp. 14-15. Again, defendant argues "this statement was made in a vacuum, and without any discussion of, reference to, or even mention of any obligation of Brandom Holdings to purchase excess inventory remaining at Black Hills should the relationship between the two companies end." Id. at p. 15.

When Gary Mallams spoke with Mr. Parziale in the winter of 2009 Parziale acknowledged being aware of the Sales Agreement. (Docket 52-9 at p. 29:6-10). They discussed the portion of the Sales Agreement which made Brandom Holdings "responsible for the inventory if they quit taking it." Id. at p. 28:6-10. Because Mr. Parziale felt he was going to be responsible for the inventory in the Sales Agreement he was "going to do the ordering." Id. at p. 27: 14-25. In their 2010 discussion, Mr. Mallams was told Mr. Parziale would be managing the inventory held by BH Molding because Brandom Holdings was "responsible" for that inventory. (Docket 48 ¶ 38).

Finally, defendant objects to the court considering a conversation between David Mallams and Ms. Brennan. (Docket 56 at p. 15). Defendant asserts Mr. Mallams simply said to Ms. Brennan that Brandom Holdings was responsible for purchasing the excess inventory held by BH Molding. Id. This statement is incomplete. For summary judgment analysis it must be remembered that on August 19, 2011, Ms. Brennan e-mailed Mr. Mallams asking "Please send me documentation of Brandom's agreements to order containers and pay for cutting/refinishing charges over and above the price quoted." (Docket 52-2 at pp. 2-3). Those materials were sent to her attention and there was no denial of the obligation by Brandom Holdings.

A jury question exists whether the declarations of defendant's employees, either individually or jointly, and the state of mind of the employees of both Brandom Holdings and BH Molding, created an enforceable promise. Garrett, 459 N.W.2d at 848.

Defendant argues that even if there was an "actionable promise" it was unreasonable for BH Molding to rely on the promise. (Docket 56 at p. 16). Defendant claims the promise would be "vague, uncertain, and unsettled." Id. For summary judgment analysis, if a jury finds a promise was made, the obligation created by the promise was clear. If BH Molding did business with Brandom Holdings, the defendant would be responsible for the inventory held at Rapid City. Brandom Holdings drew down the inventory with numerous orders and purchases from 2009 through 2012 and its purchasing managers were watching the inventory reports to control the inventory on hand at BH Molding.

Because BH Molding realized an economic benefit of approximately $223,000 by the draw down on inventory, Brandom Holdings argues the remaining $77,000 inventory cannot be perceived as a detriment to plaintiff. (Docket 56 at p. 2). Defendant argues that even if BH Molding demonstrates "an actionable promise . . . it can never demonstrate any economic injury from that reliance, much less a substantial economic injury." Id. at p. 20. Defendant's argument is without merit. Whether BH Molding is entitled to recover $77,000 or whether Brandom Holdings is the good guy who saved the plaintiff $223,000 during their relationship is a jury question.

Finally, defendant argues BH Molding cannot prove which part of the remaining inventory was acquired while Brandom Southwest was in place and which part was ordered to fill Brandom Holdings' orders. Id. at p. 22. Defendant's argument presumes it is not obligated under the Sales Agreement. Because that obligation, if any, remains a jury question, defendant's argument is without merit.

## ORDER

Based on the above analysis, it is

ORDERED that defendant's motion for summary judgment (Docket 46) is denied.

Dated September 8, 2015.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE